# APPLICABILITY OF THE EMOLUMENTS CLAUSE TO NONGOVERNMENTAL MEMBERS OF ACUS

*A nongovernmental member of the Administrative Conference of the United States does not occupy an office of profit or trust within the meaning of the Emoluments Clause.*

June 3, 2010

## MEMORANDUM OPINION FOR THE CHAIRMAN
## ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

This memorandum responds to your request that we reconsider our 1993 opinion that the nongovernmental members of the Administrative Conference of the United States ("ACUS" or "the Conference") hold an "Office of . . . Trust" within the meaning of the Emoluments Clause of the Constitution, art. I, § 9, cl. 8. *See* Memorandum for David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, from Paul R. Verkuil, Chairman, ACUS (May 18, 2010) ("Verkuil Memorandum"); *see also Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114 (1993) ("*ACUS Op.*"). The Clause forbids anyone "holding any Office of Profit or Trust" under the United States from accepting, without Congressional consent, "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. Since the issuance of our 1993 opinion, our Office has addressed the applicability of the Emoluments Clause to members of advisory committees in four published opinions, and in none of these have we concluded that the Clause was implicated.[1] In light of this subsequent guidance, we now confirm and further explain the oral advice we recently provided that a nongovernmental member of ACUS does not occupy an office of profit or trust within the meaning of the Emoluments Clause.[2]

## I.

ACUS was established in 1964 to develop recommendations to improve the efficiency and fairness of federal agencies. Among its stated purposes is to "provide suitable arrangements through which Federal agencies, assisted by outside experts, may cooperatively study mutual problems, exchange information, and develop recommendations for action by proper authorities to the end that private rights may be fully protected and regulatory activities and other federal responsibilities may be carried out expeditiously in the public interest." 5 U.S.C. § 591(1)

---

[1] *See* Memorandum Opinion for the General Counsel, Federal Bureau of Investigation, from John R. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Emoluments Clause to a Member of the FBI Director's Advisory Board* (June 15, 2007) ("*FBI Advisory Board*") (*available at* www.justice.gov/olc/opinions.htm); Memorandum Opinion for the Associate Counsel to the President, from Noel J. Francisco, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Emoluments Clause to a Member of the President's Council on Bioethics* (Mar. 9, 2005) ("*Bioethics Council*") (*available at* www.justice.gov/olc/opinions.htm); *Applicability of Emoluments Clause to "Representative" Members of Advisory Committees*, 21 Op. O.L.C. 176 (1997) ("*Representative Members*"); *The Advisory Committee on International Economic Policy*, 20 Op. O.L.C. 123 (1996) ("*IEP*").

[2] Nothing in this opinion should be viewed as expressing our views on any aspect of our 1993 opinion other than the narrow legal issue regarding the applicability of the Emoluments Clause to the nongovernmental members of ACUS.

(2006); *see also ACUS Op.*, 17 Op. O.L.C. at 114-16 (describing background and structure of ACUS). Although agencies are not compelled to follow ACUS's recommendations, several of ACUS's studies have had a significant influence on administrative law over the years. *See* Marshall J. Breger*, The Administrative Conference of the United States: A Quarter Century Perspective*, 53 U. Pitt. L. Rev. 813, 831 (1992). Congress has also, from time to time, assigned ACUS to study and formulate recommendations as to particular issues, *see ACUS Op.*, 17 Op. O.L.C. at 117 n.3 (citing several examples). Nonetheless, we are not aware of any instance in which ACUS's role has been anything but advisory in nature. *See* Verkuil Memorandum at 2 (characterizing these statutory assignments as involving "purely consultative, research, or reporting roles").

Although Congress created ACUS in 1964, the "idea of a government-sponsored organization which reviews and recommends improvements in agency procedures" dates back to a 1949 report of the Judicial Conference of the United States suggesting that the President convene such a body. *See* Breger*, supra* at 814-15. In 1953, President Eisenhower established a temporary Conference on Administrative Procedure, which consisted of representatives of federal agencies and several private-sector lawyers with expertise in administrative law. *Id.*

President Kennedy in 1961 convened a second temporary conference called the Administrative Conference of the United States, to recommend improvements regarding administrative procedure. This 1961 predecessor to ACUS was led by a Chairman, and its members consisted not only of federal agency officials but also of members of the public. *See* Exec. Order No. 10934, § 1, 3 C.F.R. 464 (1959-1963). As President Kennedy's Executive Order establishing the 1961 Conference stated, "[m]embers of the Conference who are not in Government service shall participate in the activities of the Conference solely as private individuals without official responsibility on behalf of the Government of the United States." *Id.* § 3. After several years and six plenary sessions, President Kennedy's conference issued thirty recommendations regarding administrative procedure, one of which was to establish a permanent Administrative Conference. *See* Breger, *supra* at 817-18.

In 1964, Congress did just that. *See* Pub. L. No. 88-499, 78 Stat. 615; *see also* S. Rep. No. 88-621, at 4 (1963) (noting the statute "would establish a permanent Administrative Conference of the United States"). In creating a permanent body, Congress replicated the 1961 Conference's limited advisory role of developing recommendations for improving agency procedure. S. Rep. No. 88-621, at 5 ("The basic powers of the Conference would be to study problems and make recommendations. It would have no power whatever to enforce such recommendations."). In addition, Congress established a structure much like the one that President Kennedy had established. The Conference consists of not more than 101 or fewer than 75 governmental and nongovernmental members, including a Chairman and a Council. 5 U.S.C. § 593(a); *see also id.* § 595(a) (noting that when meeting in plenary session, the Conference's members along with the Chairman and the Council are known as "the Assembly of the Conference"). ACUS's Chairman is appointed by the President for a five-year term, with the advice and consent of the Senate. *Id.* § 593(b)(1). The Council is composed of the Chairman and ten other governmental and nongovernmental members, and the latter ten members are appointed for three-year terms by the President (without Senate involvement). *Id.* § 595(b)

(2006). Congress specified that "not more than one-half [of the Council's members] shall be employees of Federal regulatory agencies or Executive Departments." *Id.*

Together, the Chairman and the Council manage several critical aspects of the Conference's operations, including the selection of a portion of the Conference's membership. Specifically, the Chairman may appoint to the Conference, with the Council's approval, not more than forty nongovernmental members for two-year terms in addition to certain government officials who are required to serve on ACUS. *Id.* § 593(b)(6) ("[T]he number of members appointed by the Chairman may at no time be less than one-third nor more than two-fifths of the total numbers of members."). These nongovernmental members are selected by the Chairman to "provide [a] broad representation of the views of private citizens and [to] utilize diverse experiences." *Id.* ("The [nongovernmental] members shall be members of the practicing bar, scholars in the field of administrative law or government, or others specially informed by knowledge and experience with respect to Federal administrative procedure.").

ACUS ceased operations on October 31, 1995, but in 2004 Congress authorized funds for ACUS, Pub. L. No. 108-401, § 2(a), 118 Stat. 2255, although no funds were appropriated before the expiration of the authorization period. In 2008, Congress reauthorized ACUS, Pub. L. No. 110-290, § 2, 122 Stat. 2914, which began operations on March 11, 2009, with the passage of the Omnibus Appropriations statute, Pub. L. No. 111-8, 123 Stat. 524.

## II.

In 1993 our Office advised that the Emoluments Clause applied to the nongovernmental members of ACUS. *ACUS Op.*, 17 Op. O.L.C. at 117. More specifically, given that ACUS's nongovernmental members were not paid for their services to the Conference, we concluded that they occupied an "Office of . . . Trust" (and not an office of profit) within the meaning of the Emoluments Clause. *Id.* We reached this conclusion for several reasons. First, we noted that ACUS was a "Federal agency established by statute." *Id.* Second, although we acknowledged that ACUS was an advisory committee as well as an agency, we cited to our then prevailing view that "'Federal advisory committee members hold offices of profit or trust within the meaning of the Emoluments Clause.'" *Id.* (quoting *Applicability of 18 U.S.C. § 219 to Members of Federal Advisory Committees*, 15 Op. O.L.C. 65, 68 (1991) ("*Section 219*")). Third, we noted that the Conference's advice and recommendations "have had (and were intended to have) a significant effect on the Government's administrative processes." *Id.* Finally, we observed that "under the Conference's own by-laws, its members may be considered to be special government employees subject to Federal conflict of interest statutes and regulations." *Id.*

Subsequent Office precedent, however, has undermined the rationale for our 1993 opinion's conclusion that nongovernmental members of ACUS are subject to the Emoluments Clause. *Cf. Representative Members*, 21 Op. O.L.C. at 176-77 (disavowing prior OLC opinion because of subsequent "refinements to our position" and because the opinion led to results that were "exceedingly incongruous" with intervening opinions of the Office). While we have previously characterized the Emoluments Clause as broad in scope, *see, e.g.*, *Applicability of the Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 17-18 (1994), the text of the Clause also makes clear that it applies only to a specified class of persons—*i.e.*, those who hold offices of profit or trust under the United

States—and not to all positions in the United States government. Consistent with that textual limitation, our precedents since our *ACUS* opinion have endeavored to give substance to that category.

In accord with this textual limitation, we have receded from the view, set forth in our *Section 219* opinion, that all federal advisory committee members hold offices of profit or trust within the meaning of the Emoluments Clause. Indeed, only months after issuing our *ACUS* opinion, we advised that this categorical position, on which the *ACUS* opinion itself appeared to rely in part, was "overbroad" and that "not every member of an advisory committee necessarily occupies an 'Office of Profit or Trust' under the Clause." Letter for Conrad K. Harper, Legal Adviser, Department of State, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel (Mar. 1, 1994). In a subsequent published opinion, we characterized that same conclusion in our *Section 219* opinion as "sweeping and unqualified," and specifically determined that members of an advisory committee established by the Department of State were not subject to the Emoluments Clause on the basis of a multi-factor test. *See IEP*, 20 Op. O.L.C. at 123. Under that test, we noted that the members of the committee were not subject to the Clause because they "meet only occasionally, serve without compensation, take no oath, and do not have access to classified information," and that "the Committee is purely advisory, is not a creature of statute, and discharges no substantive statutory responsibilities." *Id.*

In addition, on two later occasions, we concluded in published opinions that members of other advisory bodies are not subject to the prohibitions of the Emoluments Clause. In 2005, based on an extensive historical analysis of the phrase "Office of Profit or Trust," we advised that the Clause did not apply to members of the President's Council on Bioethics because that Council was "purely advisory" in nature. *See Bioethics Council* at 18; *id.* at 15 (noting that our conclusion was "generally consistent" with our Office's 1996 opinion regarding the State Department's Advisory Committee on International Economic Policy). We stated that to qualify as an office within the meaning of the Constitution, a position must "at least involve some exercise of governmental authority, and an advisory position does not." *Id.* at 10. Two years later, we advised that the Emoluments Clause did not apply to a board charged with providing advice to the FBI Director on improving the FBI's operations because that Board served a purely advisory function. *FBI Advisory Board* at 1 ("The sole role of the Board is to advise the Director, who is free to adopt, modify, or ignore its recommendations. Board members have no decisional or enforcement authority, and they exercise no supervisory responsibilities over other persons or employees as a result of their positions on the Board.").

Our *Bioethics Council* and *FBI Advisory Board* opinions go further than our *IEP* opinion and indicate that only those persons considered officers within the meaning of the Appointments Clause, U.S. Const. art. II, § 2, may be subject to the Emoluments Clause, *see*, *e.g.*, *FBI Advisory Board* at 2-3 ("The threshold question . . . in determining whether a member of the Board holds an 'Office of Profit or Trust under [the United States]' is whether a position on the Board is an 'Office under the United States'"); *Bioethics Council* at 16 ("A position that carried with it no governmental authority (significant or otherwise) would not be an office for purposes of the Appointments Clause, and therefore, under that analysis, would not be an office under the Emoluments Clause"), a conclusion that plainly would foreclose application of the Emoluments Clause here, given the purely advisory functions of ACUS. But, for present purposes, we need

not rest our decision on that ground.  Because our Office had rejected the "sweeping and unqualified" view that *all* advisory bodies are subject to the Emoluments Clause, *IEP*, 20 Op. O.L.C. at 123, even before it had issued opinions suggesting that only those persons who were officers for purposes of the Appointments Clause were subject to the Emoluments Clause, it suffices to observe that, under the precedents issued since we decided *ACUS*, the nature of this advisory body is such that its nongovernmental members cannot be deemed to hold the kind of office to which the Emoluments Clause applies.

In particular, the same factors that led us to conclude in our *IEP* opinion that the advisory committee for the State Department was not subject to the Emoluments Clause also lead to us to conclude that the nongovernmental members of ACUS, itself a purely advisory body, are not subject to it.  *See IEP*, 20 Op. O.L.C. at 123 (setting out multiple factors indicating that particular advisory body was not subject to the Clause).  Such a conclusion best accords with our Office's now substantial precedents giving substance to the Emoluments Clause through a careful explication of its proper scope, so as to ensure that concerns about foreign corruption and influence are accounted for with respect to the types of "Office[s]" that the Clause was meant to cover in identifying "Office[s] of Profit or Trust."

First, as was the case with the committee at issue in our *IEP* opinion, ACUS's nongovernmental members serve without compensation, 5 U.S.C. § 593(c) (2006) ("Members of the Conference, except the Chairman, are not entitled to pay for service."), and meet only on an occasional basis.  By law, the Conference as a whole (*i.e.*, the Chairman, the Council, and ACUS's governmental and nongovernmental members) is required to meet for "at least one plenary session each year," *id.* § 595(b)(1), and we understand that the practice was to convene two such sessions a year.  ACUS's Council has in the past typically met only five to six times a year.  *See* E-mail from Paul R. Verkuil, Chairman, ACUS, to Daniel L. Koffsky, Deputy Assistant Attorney General (May 28, 2010, 8:40 EST) ("Verkuil E-mail").  In addition, most ACUS members also participate in various subject matter committees, which in the past have held four or five meetings a year.  *See* 1 C.F.R. § 302.3 (1995) (listing ACUS's standing committees).  By any measure, then, the nongovernmental members of ACUS "meet only occasionally."  *IEP*, 20 Op. O.L.C. at 123.

To support the application of the Emoluments Clause, our 1993 opinion did point to the status of ACUS's members as special government employees ("SGEs") subject to federal conflict of interest statutes and regulations.  *See ACUS Op.*, 17 Op. O.L.C. at 117.  Advisory committee members often have that status, however, and subsequent opinions of this Office make clear that this factor is far from determinative.  *See IEP*, 20 Op. O.L.C. at 123 (concluding that advisory body members were not subject to the Emoluments Clause notwithstanding their SGE status); *see also Representative Members*, 21 Op. O.L.C. at 177 ("special government employees on some advisory committees do not occupy offices of profit or trust").

Moreover, as was also the case with the committee members at issue in *IEP*, 20 Op. O.L.C. at 123, neither the statutes nor the bylaws governing ACUS indicate that its nongovernmental members would be given access to classified information.  *See* Verkuil Memorandum at 5 n.7 ("I cannot foresee any likelihood that nongovernmental members of ACUS would require . . . access [to classified information] in the performance of their role with

ACUS, particularly because ACUS is barred by statute from addressing 'a military or foreign affairs function of the United States.'" (quoting 5 U.S.C. § 592(1))). It is the case that, unlike the committee members in *IEP*, the nongovernmental members of ACUS have traditionally taken oaths of office. *See* Verkuil E-mail. We are uncertain how longstanding this practice is, however, and, we understand that, in contrast to the requirements of several other federal agencies, ACUS's nongovernmental members are not required to take an oath by either organic statute or governing regulations. *Cf.* 12 U.S.C. § 242 (2006) (requiring members of the Board of Governors of the Federal Reserve System to "make and subscribe to the oath of office"); 16 U.S.C.A. § 831g(c) (West Supp. 2010) (requiring Board members of the Tennessee Valley Authority to take an oath of office). Thus, while there is support for the notion that the taking of an oath may in certain circumstances indicate a constitutional office, *see*, *e.g.*, Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 6 (1890) (noting that "the taking of the oath is not an indispensable criterion" of an office), for purposes of analyzing purely advisory bodies, this factor is, in our view, not particularly weighty.

We have arguably indicated that supervisory or decisional control may be of some relevance in determining the applicability of the Emoluments Clause to an advisory body, *cf. FBI Advisory Board* at 1 (noting that the Board was not subject to the Emoluments Clause in part because its members "have no decisional . . . authority, and they exercise no supervisory responsibilities over other persons or employees as a result of their positions on the Board"), but even if that factor is relevant, it is not significant here. The Council and the Assembly (*i.e.*, ACUS's membership meeting in plenary session, 5 U.S.C. § 595(a)) do appear to have authority over certain limited decisions of the Chairman, *see*, *e.g.*, *id.* § 595(b)(7) (Council may "approve or revise the budgetary proposals of the Chairman"); *id.* § 595(c)(5) (Chairman may "appoint, with the approval of the Council, members of committees authorized by the bylaws and regulations of the Conference"); *id.* § 595(c)(10) (Chairman may "organize and direct studies ordered by the Assembly or the Council"), but nongovernmental members are likely to constitute only a minority of the members of the Conference and the Council. By statute, no more than two-fifths of the Conference's general membership may consist of nongovernmental persons, 5 U.S.C. § 593(b)(6), while ACUS's Council may be composed of a majority of government officials. *See id.* § 595(b) (permitting the appointment of up to five government officers, in addition to the Chairman, on the eleven-person Council). That Congress did not structure ACUS to ensure a majority of nongovernmental members reinforces our view that such members were not vested (either individually or collectively) with the type of discretion and authority that inheres in an office of profit or trust within the meaning of the Emoluments Clause. In light of ACUS's purely advisory function as well as its governance structure, we do not believe its nongovernmental members exercise the type of supervisory power or decisional authority that could potentially be relevant to a conclusion that they are subject to the Emoluments Clause.

We acknowledge that ACUS is established by statute and that we have characterized it as an "agency." We emphasized these points in our 1993 *ACUS* opinion, 17 Op. O.L.C. at 117, and appealed to it again in distinguishing our application of the Emoluments Clause to ACUS from our conclusion that the Clause did not apply to the President's Bioethics Council, which also exercised purely advisory functions, *see Bioethics Council* at 16. In the latter opinion, we observed that "while nominally called an 'advisory committee,' [ACUS] was, in fact, a 'Federal agency established by statute' with certain statutorily assigned powers and functions."

*Id.*; *see also IEP*, 20 Op. O.L.C. at 123 (noting that advisory panel was "not a creature of statute"). In neither opinion, however, did we explain precisely why ACUS's status in this regard would be significant to the analysis of whether ACUS's nongovernmental members are subject to the Emoluments Clause, and on reflection we do not believe that it is.

To be sure, ACUS's policy recommendations may "have had (and were intended to have) a significant effect on the Government's administrative processes," *id.*, and our prior characterization of it as an "agency" is reflective of the importance of its mission. But this status ultimately does not meaningfully distinguish ACUS from other similar advisory bodies, which also are established to play an important advisory role in the formulation of public policy. In our *IEP* opinion, for example, we did not suggest the advisory committee at issue there was exempt from the Clause because its mission was unimportant, and the Office's consistent decisions since 1993 have rejected the Clause's application to various advisory committees, even though they plainly had been charged with important missions. *Cf. FBI Advisory Board* at 1 (concluding that the Advisory Board was not subject to the Clause, while noting that it was charged with recommending to the FBI Director how the "FBI can more effectively exploit science and technology to improve its operations, particularly its priorities of preventing terrorist attacks, countering foreign intelligence operations, combating cyber-based attacks, and strengthening the FBI's collaboration with other federal law enforcement agencies."). And the mere fact that ACUS is not within an otherwise established agency does not provide a sufficient basis for drawing a different conclusion. Not every position in a free-standing agency constitutes an office of profit or trust within the meaning of the Emoluments Clause, and thus we do not think that the entity's location within the federal government is determinative of whether ACUS's nongovernmental members are subject to the Clause.

Nor do we believe that the fact that ACUS was established by statute compels the judgment that the Clause applies to that entity's nongovernmental members. Here, too, recent precedents of the Office are in direct tension with such a conclusion. For example, Congress by statute required the FBI Director to establish a board to advise on certain matters, *see* Pub. L. No. 108-7, § 109, 117 Stat. 11, 67 (2003), and yet we nevertheless concluded that its members were not subject to the Emoluments Clause. *FBI Advisory Board* at 3. Similarly, although statutes created both the purely advisory Board of Trustees of the Federal Old-Age and Survivors Insurance Trust Fund and Federal Disability Insurance Trust Fund and the purely advisory Board of Trustees of the Federal Hospital Trust Insurance Fund, *see* 42 U.S.C.A. § 401(c) (West Supp. 2009); 42 U.S.C. § 910 (2006), we advised that the members of neither were subject to the Emoluments Clause. *See* E-mail for John Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, from Daniel L. Koffsky, Special Counsel, Office of Legal Counsel (Jan. 22, 2008, 12:31 EST) (memorializing oral advice). But equally importantly, we do not see why the fact that ACUS is established by statute matters here. The Clause's underlying concerns with undue foreign influence and corruption would seem, in principle, to be no more relevant with respect to the nongovernmental members of a purely advisory agency like ACUS that has been established directly by statute than they would be with respect to the nongovernmental members of an important advisory body that Congress has by statute authorized an executive official to establish. Consistent with this judgment, our precedents since 1993 provide no support for concluding that the Clause applies whenever (as will often be the case) an advisory committee's creation may be traced to a statute; indeed, these precedents point against that conclusion in

rejecting the "sweeping and unqualified view" that all advisory committees are subject to the Clause. *See IEP*, 20 Op. O.L.C. at 123. Thus, particularly given our Office's subsequent precedents, we do not believe ACUS's status as a statutorily created entity, *ACUS Op.*, 17 Op. O.L.C. at 117, 123 n.10, provides sufficient ground to compel the application of the Emoluments Clause to ACUS's nongovernmental members, even assuming that the Clause may apply in some instances to persons who do not hold an office under the Appointments Clause.

## III.

For the reasons given above, we conclude that the Emoluments Clause does not apply to the nongovernmental members of ACUS.

/s/

DAVID J. BARRON
Acting Assistant Attorney General